Dean WOODS, et al., Plaintiffs,

v.

BARNETT BANK OF FT. LAUDER-
DALE, Defendant.

No. 78–6266–Civ–JLK.

United States District Court,
S.D. Florida.

Nov. 22, 1983.

J. Michael Rediker, Ritchie & Rediker, Birmingham, Ala., Gunn, Venney & Buhler, Miami, Fla., for plaintiffs.

Earl Faircloth, Faircloth, Easthope & Traver, Fort Lauderdale, Fla., for defendant.

## FINAL JUDGMENT

JAMES LAWRENCE KING, District Judge.

## INTRODUCTION

On 1 October 1974 the Securities and Exchange Commission ("Commission") filed suit against R.J. Allen & Associates, Inc., Alexander & Allen, Howard William Alexander, A & A Enterprises, All Enterprises, Robert J. Allen and others for various violations of the Securities and Exchange Act. *Securities and Exchange Commission v. R.J. Allen & Associates, Inc.*, 386 F.Supp. 866 (S.D.Fla.1974). In reaching the decision in that case, Judge Charles B. Fulton found that R.J. Allen was organized in August 1972, under the laws of the State of Florida and that prior to February 26, 1972, it had been known as Alexander and Allen, Inc. From about November, 1972, to October, 1974, R.J. Allen and Associates, Inc., operated under the direction, control, and management of Robert J. Allen and H. William Alexander, and was selling securities commonly referred to as "municipal bonds."

As a part of its business, R.J. Allen and Associates, Inc. engaged in the offer, sale and underwriting of Industrial Development Revenue Bonds ("IDR's") of numerous issuers. These bonds, while generally included in the class of "municipal bonds," are not general obligation bonds of a political entity, nor are they backed by the full faith and credit of any municipality, state or local taxing unit. Their viability depends on the ability of the company funded by the proceeds from the bond sales to generate sufficient revenues to meet the principal and interest payments due on the bonds. At the trial the Commission's expert witness testified that the IDR's sold by R.J. Allen, Inc. were among the worst, from an investment standpoint, that he had seen in 24 years in the business.

With regard to the IDR's involved in the case now before this court, Judge Fulton found that R.J. Allen and its associates failed to disclose to the investors that Allen and Alexander were principals of All Enterprises and A & A Enterprises, a related company; failed to disclose that Allen and Alexander would derive substantial benefits from any sales of that bond issue; and failed to disclose that All Enterprises received in excess of $550,000 from the Tuskegee, Alabama, bond issue on requisitions put in by Alexander which were not verified by the Tuskegee Industrial Development Board. In addition to various misrepresentations as to the security of the IDR's, R.J. Allen and its associates engaged in certain practices which so pervaded their business that they rendered the entire operation a fraudulent and deceptive scheme and course of conduct designed to defraud investors.

In summary, Judge Fulton found that: [T]he evidence in this case describes a horrible fraud, one that has been vicious and brutal. It is difficult to imagine how anyone could contrive and execute a more diabolical scheme. It has effectively defrauded and cheated the customers of R.J. Allen who purchased IDR's, many of whom have been left destitute. Indeed, the proof of all of the fraud allega-

tions contained in Count I of the Commission's Complaint has been conclusive and overwhelming with respect to each defendant, separately and collectively, particularly including the defendant Alexander.

*SEC v. R.J. Allen and Associates, Inc.* at 874.

In the case at bar, some of the victims of the fraud described by Judge Fulton have joined together as a class to sue the Barnett Bank of Ft. Lauderdale as an aider and abettor of Allen and Alexander in their perpetration of the fraud. The plaintiffs allege that the defendant Bank, through its various officers and employees, had a general awareness that its role with Allen and Alexander was part of an overall activity that was improper and that the defendant Bank knowingly and substantially assisted in perpetration of that securities fraud.

The class members seek (I) recovery of approximately $50,000 received by the Bank from liquidation of certain certificates of deposit ("CD's") and from debits to certain accounts controlled by Alexander, (II) recovery of $2,292 charged by the Bank against an account controlled by Alexander, (III) recovery of approximately $90,000 of bond issue proceeds disbursed from the A & A account as loans to, or for purchase of stock in, Arthritis Clinics International ("ACI") (IV) recovery of other disbursements to Alexander or ALL for unspecified "loans" and similar purposes, (V) recovery of all $550,000 of bond proceeds received by A & A into its account at the Bank, and (VI) interest, punitive damages, costs and attorneys' fees.

The plaintiffs and class members are purchasers of Industrial Development Revenue Bonds ("Bonds"), Series 1973-ALL, issued by the Industrial Development Board ("Board") of the City of Tuskegee, Alabama, and the defendant is a banking institution with its principal place of business in Fort Lauderdale, Florida. The purpose of the Bond issue of the Industrial Development Board was to raise funds by which a hydroponics tomato farming operation would be constructed in the vicinity of Tuskegee, Alabama. The bonds were issued pursuant to a document entitled Mortgage and Indenture of Trust ("Trust Indenture") executed and then recorded in Macon County, Alabama, on January 23, 1974, providing for the issuance and sale of $1,500,000 of bonds.

The Bonds defaulted after the second semiannual coupon was paid. No further payments of interest or principal on any of the Bonds were made after the October 1, 1974, coupon. At the time of this suit, $1,210,000 face amount of the Bonds had been sold, and all of the principal amount was outstanding and unpaid, together with coupons maturing April 1, 1975, and for subsequent periods on all of said Bonds.

This Court has subject matter jurisdiction of the claims of the plaintiffs and class against the Bank brought pursuant to Rule 10b–5 under the Securities Exchange Act of 1934 and has properly exercised its power of pendent jurisdiction over the state law claims and over the parties with respect to the state law claims for conversion and aiding a breach of trust. This case was certified as a properly constituted class action under F.R.C.P. 23(a) and (b)(3). The court has personal jurisdiction of the parties and venue is proper.

## FINDINGS OF FACT

In July 1973, Robert Allen and Howard Alexander were approached by C. David Smith of the Barnett Bank and asked to move their banking business to the Barnett Bank of Ft. Lauderdale. A few months later, in September of 1973, Alexander and Allen opened a checking account with the Barnett Bank and applied for a $50,000 loan, repayable out of "income from bond sales." In October Alexander and Allen asked David Smith if the Barnett Bank would be interested in acting as the Trustee for the Alabama tomato project. Although the Bank did not have a trust department at that time, it contacted its holding company to see if the Bank might set up a trust department. The Bank was told by Brad Middlebrook, then of Delray National Bank, that he would have absolutely

no interest in such a project. The Bank, after being warned by Mr. Middlebrook that small bond houses were experiencing a great deal of trouble financially and that Alexander and Allen might be in trouble, declined to act as trustee. In December, Barnett Bank was again offered the trust business growing out of Alexander and Allen's bond business and again Barnett Bank was advised by Brad Middlebrook that he was not interested.

In January, the Covington County Bank agreed to serve as trustee of the tomato project and the bond issue was actually closed. But because the delivery instructions for the firm underwriting called for payment of all the Bonds at the closing of the Bond issue and because Alexander and Allen could not comply with that instruction at the closing on 23 January, the Covington County Bank did not physically deliver the Bonds at the closing. In lieu of full payment, Covington County agreed that the Bonds could be partially delivered against payment. The net effect of this arrangement was that the money piled up in the trust account at Covington County Bank pending full payment and no disbursements were to be made to the A & A Enterprises until full payment was made.

Anxious to have the money transferred to their account, Alexander and Allen approached R.E. Prentiss, Vice-President of Barnett Bank, and asked that he write a letter of recommendation to the Covington County Bank assuring Covington County of Alexander's and Allen's trustworthiness. Prentiss attempted to comply with this request and drafted a letter for Alexander and Allen. The next day Alexander and Allen received the letter and decided that it was not sufficient for their purposes. They then returned to the Bank and asked David Smith to draft a second letter using stronger language. Smith complied with their request and drafted the following letter:

> I have reviewed the investment banking agreement between Alexander & Allen, Inc. and All Enterprises, Inc. dated November 20, 1973. This agreement is sim-
ilar to the corporation's previous investment banking agreements which they have previously fulfilled without any difficulty. There is no reservation, in my mind, that this agreement can and will be met as agreed to.

In fact, Mr. Smith had not reviewed the investment banking agreement and was not aware of any of the corporation's previous investment banking agreements and had no knowledge that they had ever fulfilled any such contract. Mr. Smith issued the letter of recommendation as a favor to Allen and Alexander because of their substantial deposit relationship with Barnett Bank. He issued this letter with reckless disregard for its consequences even though, as he testified in his deposition of 14 December 1976, he knew that bankers lived by a code of confidence and if one banker told another banker something, the second banker would expect to be able to and would rely on what was stated. Based on this letter of assurance, Covington County Bank began piecemeal distribution of the proceeds to A & A Enterprises in March. Those distributions eventually totaled $550,000.

In March and April, the first distribution of these proceeds was deposited in the Barnett Bank. From the deposited funds $6,000 was paid to H. William Alexander and Associates to pay twelve months rent in advance; $6,000 was paid to Howard William Alexander as a personal loan; $50,-000 was paid to Barnett Bank for certificates of deposit registered to A & A Enterprises or H. William Alexander; $4,500 was paid for an ACI stock advance. The $50,-000 in certificates of deposit was pledged as collateral for a loan of $50,000 from the Barnett Bank to Alexander, personally.

## CONCLUSIONS OF LAW

The parties agree that the law controlling liability for aiding and abetting a violation of Rule 10b–5 of the Securities Exchange Act of 1934 is stated in *Woodward v. Metro Bank of Dallas*, 522 F.2d 84 (5th Cir.1975). In *Woodward* the plaintiff sued the primary defendant for securities fraud and sued a bank as secondary defendant

for aiding and abetting in the perpetration of that fraud. The bank loaned money to the primary defendant and executed two security agreements with the plaintiff to secure the money loaned and to cross collateralize other debts owed by the primary defendant. Shortly thereafter, the primary defendant declared bankruptcy and the bank foreclosed on the plaintiffs collateral. The court in *Woodward* held that liability should be judged by a three prong test:

Before someone can be caught within the net of aiding and abetting liability under Rule 10b–5, another party must have violated the securities laws, the alleged aider-abetter must be generally aware of his role in improper activity, and he must knowingly render substantial assistance.

*Woodward,* at 97.

The court started with the assumption that the first prong of aiding and abetting liability test had been met. As for the second prong, the court held that before liability could be imposed there must be some knowledge by the bank of its role in the improper activity. The court reasoned that to impose liability where an illegal scheme by third parties existed in violation of 10b–5 but where the bank only loaned money to those third parties without the bank knowing of the fraud would be to make the banks insurers. *Woodward* at 96. The court also noted that "knowledge may be shown by circumstantial evidence, or by reckless conduct, but the proof must demonstrate actual awareness of the party's role in the fraudulent scheme." *Woodward* at 96.

As for the third prong of the test, that the aider-abetter must knowingly render substantial assistance, the court stated:

In a case combining silence/inaction with affirmative assistance, the degree of knowledge required should depend on how ordinary the assisting activity is in the business involved. If the evidence shows no more than transactions constituting the daily grist of the mill, we would be loathe to find 10b–5 liability without clear proof of intent to violate the securities laws. *Conversely if the*

*method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability.* In any case, the assistance must be substantial before liability can be imposed under 10b–5.

*Woodward,* at 97. (citations and footnotes omitted). (emphasis added).

Applying this law to the facts of the case before it, the court then concluded that it could not find that the Bank possessed the knowledge or perpetrated the substantial assistance required for the imposition of liability.

It is beyond all question that the plaintiff class in the case now at bar was the victim of a securities fraud. Any doubt as to that issue dissipated with Judge Fulton's decision in the SEC case. As for the remaining two prongs of the aider-abettor liability test, the plaintiff charges that the Bank substantially assisted in the fraud by:

1. acting as the principal credit reference for Alexander and Allen;

2. acting as the major clearing agency for the Bonds in question;

3. issuing $50,000 in certificates of deposit in the name of A & A Enterprises or William Alexander and then accepting those certificates as collateral for a *personal* loan made to Alexander;

4. loaning $26,000 to the underwriter, Alexander & Allen;

5. acting as the depository for the related companies involved in the fraud;

6. and, issuing cashier's checks and wire transfers in aid of the illegal distribution of the funds in question.

■ Because of this Court's holding, it is unnecessary to discuss the last five charges of assistance in detail; all of the money sought in those five charges is subsumed in the $550,000 sought under the first charge and the plaintiffs may recover the money only once. But the court will briefly consider all the forms of assistance challenged. The acts of the bank in serving as a clearing agent for the bonds, loan-

ing $26,000 to the underwriter, acting as a depository for the related companies involved in the fraud and issuing cashier's checks and wire transfers were normal banking transactions. There is no proof that the bank performed those acts with knowledge that it was assisting in an improper activity. Accordingly, the plaintiffs have failed to prove a case for aider and abettor liability on these four grounds.

■ As to the act of issuing $50,000 in certificates of deposit in the name of A & A Enterprises or William Alexander and then accepting those certificates as collateral on a personal loan made to Alexander and then foreclosing on those certificates and taking the money to satisfy the debt, the court finds that the Bank acted in violation of several court orders concerning the assets of Alexander and Allen and departed from normal banking practice in doing so. The testimony shows that it was highly unusual to issue the certificates in the joint names of the corporation and individual. That action satisfied the *Woodward* test for aiding and abetting liability in that it was atypical and lacked business justification. It, therefore, supports the inference that the Bank had the requisite knowledge and knowingly assisted the fraud.

■ All this is of secondary importance however since the court finds that the Bank's action of 22 February, 1973, supports liability for aiding and abetting the perpetration of a 10b–5 fraud. By his letter of 22 February, David Smith knowingly assisted Alexander and Allen in arranging to have the trust funds released before the entire bond issue was sold. Smith's action was in reckless disregard of the consequences it might cause and it was committed for the express purpose of favoring a good client. David Smith admits that he did not know if the contents of the letter were true and he admits that he issued it knowing that Covington County Bank, to whom the letter was addressed, would treat it as a confidence and rely on it. The Covington County Bank did treat the letter as such a confidence and did rely on it when they released the trust funds prior to

the complete sale of the bonds. This act satisfies the last two prongs of *Woodward* in that the Bank's "general awareness of its role in the improper activity" may be inferred from this reckless conduct and its "knowing renderance of substantial assistance" may be inferred from this action that was atypical and lacked business justification. The letter was disastrously reckless and was atypical and had absolutely no business justification other than to curry the favor of the Barnett Bank's good depositer, Alexander and Allen.

This decision is in accord with the *Woodward* court's opening statement that "We must be certain that neither all commercial banking transactions, nor accommodation loans, nor notes are beyond the pale of 10b–5's strictures. We must interpret the Act so that financial ingenuity cannot overrun the legitimate scope of [the Act's] coverage." *Woodward* at 96.

Accordingly, judgment should be entered against Barnett Bank of Fort Lauderdale, the Defendant, and in favor of the Plaintiff class in the total amount of $550,000.

## ATTORNEY'S FEES

■ The plaintiffs have also asked the Court to award them attorney's fees based on the bad faith doctrine as established in *Barton v. Drummond*, 636 F.2d 978, 985 (5th Cir. Unit B, 1981). In that case, the Court held that "upon a finding of bad faith prior to, or in the course of, the litigation, assessment of attorney's fees against [the defendant] would be appropriate." The bad faith complained of in *Drummond* was that defendant's prelitigation conduct left the plaintiff no alternative but litigation, despite the defendants' duty to deal fairly with the respective plaintiffs.

The substance of the plaintiffs' claim for bad faith attorney's fees in the case now before the bar is that the defendant refused to return the $50,000 initially put in C.D.'s which were subsequently foreclosed by the Bank. The plaintiffs state that the Bank's retention of these funds was in clear violation of several court orders and

in violation of the plaintiff's interest in those funds and that the defendant forced the plaintiffs to sue to protect their rights.

The court finds that these allegations are in fact true. But, the lawsuit involved much more than just the $50,000 in the C.D.'s and the court's judgment is based on grounds completely separate from the C.D.'s. Accordingly, the Motion for Award of Attorney's Fees is denied. However, the court notes that if its judgment were based on the issues involved with the $50,000 in C.D.'s, its determination of the motion for attorney's fees might be different.

## PREJUDGMENT INTEREST

 Similarly, the plaintiffs' motion for prejudgment interest must be denied. In support of their demand for prejudgment interest the plaintiffs have argued that where the measure of recovery is greater under the pendent state claims and the plaintiff has proved both the federal and state claims, the award will not be limited to the actual damages award under Rule 10b–5. The plaintiffs then go on to argue that under trust law and the law of conversion it is entitled to prejudgment interest. However, as previously stated, the award in this case is based solely upon 10b–5 liability. The Plaintiffs' arguments for interest under the pendent claims are not appropriate. Further, the Court declines to exercise its discretion under 10b–5 so as to allow the claim for interest.

## PUNITIVE DAMAGES

Finally, the plaintiffs' demand for punitive damages must be denied. As was the case with the prejudgment interest issue, the plaintiffs have based their demand for punitive damages on the breach of trust and conversion claims. Since this case has been decided entirely on the 10b–5 issue, the demand for punitive damages is inapposite.

## CONCLUSION

Accordingly, the Court does:

ORDER and ADJUDGE that the plaintiffs in this action recover of the defendant Barnett Bank of Fort Lauderdale the sum of $550,000 for which sum let execution issue. The plaintiffs are entitled to costs of this action which will be taxed upon appropriate motion. The plaintiffs' demands for prejudgment interest, punitive damages and attorney's fees are DENIED.