765 F.2d 1004
 Fed. Sec. L. Rep. P 92,234
Dean WOODS, et al., Plaintiffs-Appellees, Cross-Appellants,
v.
BARNETT BANK OF FORT LAUDERDALE, Defendant-Third-Party
Plaintiff-Appellant- Cross-Appellee,
Alexander and Allen, Inc., et al., Third-Party Defendants.
 No. 84-5106.
 United States Court of Appeals,
Eleventh Circuit.
 July 15, 1985.
 
 Mahoney, Hadlow & Adams, Earl B. Hadlow, Robert J. Winicki, Olivia Watts Martin, Jacksonville, Fla., Faircloth, Easthorpe & Traver, Earl Faircloth, Ft. Lauderdale, Fla., William H. Adams III, Jacksonville, Fla., for third-party plaintiff defendant-appellant, cross-appellee.
 Ritchie & Rediker, J. Michael Rediker, Birmingham, Ala., Shutts & Bowen, Robert E. Venney, Miami, Fla., for plaintiffs-appellees, cross-appellants.
 Appeals from the United States District Court for the Southern District of Florida.
 Before HILL, KRAVITCH and SMITH*, Circuit Judges:
 KRAVITCH, Circuit Judge:
 
 
 1
 On cross-appeals from a judgment of the United States District Court,[1] plaintiffs, members of a class of investors who purchased bonds that defaulted before maturity, endorse the district court's holding on liability and compensatory damages, but challenge the court's refusal to award prejudgment interest, punitive damages, and attorneys' fees. Defendant Barnett Bank of Fort Lauderdale attacks the court's theory of liability and measure of damages. The court below imposed aiding and abetting liability on Barnett Bank for its employee's substantial assistance to and participation in a securities fraud that was committed in violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. Sec. 240.10b-5. The perpetrators of the fraud were the subject of a proceeding brought by the Securities Exchange Commission (SEC), SEC v. R.J. Allen & Associates, Inc., 386 F.Supp. 866 (S.D.Fla. 1974), but they are not involved in this appeal. The district court awarded $550,000 in damages to the class, but denied the other forms of relief requested. We affirm.
 
 I. BACKGROUND
 A. The Primary Actors
 
 2
 Robert J. Allen and H. William Alexander were the principal actors in this scheme. The two men organized a corporation, Alexander & Allen, Inc., in the state of Florida in August 1972. On February 26, 1974, the corporation changed its name to R.J. Allen & Associates, Inc. From 1972 to October 1974, this entity was in the business of selling securities commonly referred to as municipal bonds. Alexander and Allen also were the sole shareholders in two other entities, A & A Enterprises, and All Enterprises.[2]
 
 
 3
 As part of its business, Alexander & Allen, Inc. engaged in the underwriting of industrial development revenue bonds of numerous issuers. Although these bonds came within the definition of municipal obligations, they were not general bonds issued by a political entity nor were they secured by the taxing power of any political unit. Rather, their strength as investments depended entirely on the ability of a company funded by the bond sales to put the proceeds to use and generate revenue sufficient to meet the principal and interest payments when due. Thus, these bonds were a speculative, high risk investment, includable in the class of municipal securities because interest payments received by bondholders were tax exempt.
 
 
 4
 In July 1973, C. David Smith, a loan officer at Barnett Bank, was introduced to Alexander and Allen by a friend who related that the two were dissatisfied with their present bank. Smith asked them to move their financial business to Barnett Bank and the two agreed. Shortly thereafter, they opened a checking account at Barnett Bank and applied for and received a $50,000 loan. On the loan application form they stated that the source of repayments would be "income from bond sales." Alexander and Allen, through their several businesses, maintained a substantial banking relationship with Barnett Bank until the SEC's action commenced in the fall of 1974.
 
 B. The Tuskegee Bond Issue
 
 5
 In early 1973, Alexander and Allen became involved in the planning of a hydroponic tomato farming project in Alabama. To finance their proposal, the two men approached the Tuskegee, Alabama, Industrial Development Board, which agreed to issue industrial revenue bonds on behalf of the project. In October 1973, Alexander and Allen described their tomato farming project to Smith, hoping to convince Barnett Bank to act as trustee for the accompanying bond issue. Barnett Bank did not have a trust department at that time, so it sought to determine whether its holding company was interested in the project. Brad Middlebrook, then of Del Ray National Bank, refused this offer, stating that many small bond houses were having a great deal of trouble financially at that time.
 
 
 6
 Alexander & Allen, Inc. was named to act as underwriter for the bond issue,[3] with Covington County Bank of Andalusia, Alabama ultimately agreeing to serve as trustee. All Enterprises and A & A Enterprises were to put the proceeds of the bond issue to use in constructing and operating the tomato farming project. As underwriter, Alexander & Allen, Inc. obligated itself to purchase the entire bond issue, which totalled $1.5 million, for resale to the public. In its role as trustee, Covington County Bank agreed to deliver the bonds to the underwriter upon payment of the purchase price. The exchange was scheduled to take place on January 23, 1974, the closing date for the bond issue.
 
 
 7
 Class representative Dean Woods testified that he placed his order for the bonds during the latter part of 1973. He did not receive the bonds at that time because none of the bonds were to be released until all were purchased. When the closing date finally arrived, only a small portion of the bond issue had been ordered by investors. Because the underwriter had not yet sold enough bonds or raised money in another fashion to pay for the entire issue, Covington County Bank did not deliver the bonds at the closing as planned. As an alternative, the underwriter suggested that Covington County Bank allow piecemeal distribution of the bonds. The trustee agreed to this, releasing bonds as Alexander & Allen, Inc. paid for them.[4] Woods testified that he received his bonds in two shipments; one arriving around February 1, 1974, and the other sometime during the spring of that year. According to Covington County Bank's trust agreement, no money could be distributed to A & A Enterprises until all the bonds had been purchased by the underwriter. Hence, this arrangement caused the money received upon sale of the bonds to investors to accumulate in the trust account.
 
 
 8
 Although it complied with the underwriter's request to allow piecemeal distribution of the bonds, Covington County Bank was not comfortable with this gradual distribution. Eager to dispel the trustee's anxieties, Allen went to Barnett Bank, hoping to obtain a letter of recommendation to assure Covington County Bank of the underwriting firm's trustworthy character. Apparently, Allen initially sought Smith's assistance, but Smith was not present in the office at the time, so Allen turned to R.E. Prentiss, the Bank's vice president. Prentiss drafted a letter in an effort to comport with the request. Not satisfied with Prentiss' letter, however, Allen, accompanied by Alexander, returned to Barnett Bank the next day. They found Smith, explained why Prentiss' letter was not sufficient, and asked Smith to write a stronger letter. Smith addressed the following letter to L.R. Deal, President of Covington County Bank:
 
 
 9
 I have reviewed the investment banking agreement between Alexander and Allen, Inc., and All Enterprises, Inc. dated November 20, 1973. This agreement is similar to the corporation's previous investment banking agreements which they have previously fulfilled without any difficulty. There is no reservation, in my mind, that this agreement can and will be met as agreed to.
 
 
 10
 In fact, Smith had not reviewed the investment banking agreement and was not aware whether the corporation had fulfilled similar agreements. Rather, he wrote the letter, stating essentially what Alexander and Allen wanted him to write, as a favor to them because of the substantial amounts they kept on deposit with Barnett Bank. Shortly after receiving this letter, Covington County Bank began to distribute the proceeds of the bond issue to A & A Enterprises, thereby violating its trust agreement because a portion of the bonds had not been purchased by the underwriter.
 
 
 11
 Sales and distribution of the bonds continued through the spring and summer of 1974, but the entire bond issue was never exhausted. During this period, Covington County Bank made several disbursements of the proceeds of the bond issue, totalling $550,000, to A & A Enterprises, which was deposited in an account at Barnett Bank. Over the next few months, some of the deposited funds were used for purposes varying from those stated in the prospectus; for example, $6,000 was used to prepay twelve months' rent for H. William Alexander & Associates, a brokerage firm; Alexander received $6,000 in the form of a personal loan; Alexander used $50,000 more to secure a personal loan from Barnett Bank in the form of certificates of deposit; and Alexander took $4,500 to pay for stock in another corporation, Arthritis Clinic International.
 
 
 12
 Two semiannual interest payments were made to the investors in the Tuskegee bond issue. On October 1, 1974, the SEC brought an action against the underwriter, Alexander, Allen, and several other individuals, alleging securities violations arising out of certain Industrial Development Revenue Bond issues, including the one in Tuskegee. In SEC v. R.J. Allen & Associates, 386 F.Supp. 866 (S.D.Fla.1974), the district court held that the defendants had violated the securities laws, enjoined the defendants from committing further violations, appointed a receiver for the underwriter, and ordered that the defendants "disgorge" all monies received from investors. Since the SEC proceeding, the bonds have been in default.
 
 
 13
 In 1975, purchasers of the Tuskegee bond issue formed a class to bring suit against Covington County Bank and other defendants. This action ultimately settled. The instant case was initiated in 1978, charging that Barnett Bank was secondarily liable for the securities fraud[5] and accusing Barnett Bank of several state law violations. Following a nonjury trial, the court issued an opinion focusing on two actions involving Smith in discussing whether there was sufficient evidence to impose aiding and abetting liability on Barnett Bank. First, the court noted that Smith encouraged Alexander to secure a personal loan with a certificate of deposit, issued jointly to Alexander and A & A Enterprises, when the money used to obtain the certificates belonged solely to A & A Enterprises. Upon learning that Alexander was the subject of an investigation by the Securities and Exchange Commission, Smith immediately foreclosed the certificates to satisfy the loan. The court found that Smith's actions violated several court orders and departed from normal banking practice.
 
 
 14
 The court opined that this transaction was really of secondary importance, however, because Smith's letter was sufficient to impose liability on the bank for aiding and abetting the fraud. By this letter, which the court described as "disastrously reckless," the court found that Smith knowingly assisted Alexander and Allen in arranging to have the trust funds released before the entire bond issue was sold. Smith admitted that he did not know the truth or falsity of the letter's contents, and that he knew Covington County Bank would rely upon the letter, as an expression of confidence from one banker to another. The court found that Covington County Bank did treat the letter as such, and relied on it in releasing the trust funds before all the bonds were sold. From this, the court inferred Barnett Bank's "general awareness of its role in the improper activity," and the court inferred the Bank's "knowing renderence of substantial assistance" because the action was atypical and lacked business justification.[6]
 
 II. ELEMENTS OF AIDING AND ABETTING
 
 15
 In Woodward v. Metro Bank of Dallas, 522 F.2d 84 (5th Cir.1975),[7] this circuit's predecessor set forth the elements necessary for establishing liability for damages as an aider and abettor of a violation of section 10(b) or Rule 10b-5:
 
 
 16
 [A] person may be held as an aider and abettor only if some other party has committed a securities law violation, if the accused party has general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation.
 
 
 17
 522 F.2d at 94-95 (quoting SEC v. Coffey, 493 F.2d 1304, 1316 (6th Cir.1974), cert. denied, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975)).[8] Mindful of the potentially devastating impact aiding and abetting liability might have on commercial relationships, see generally Ruder, Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification and Contribution, 120 U.Pa.L.Rev. 597, 620-645 (1972), the Woodward court carefully elucidated the second and third prongs of its test. In discussing the "general awareness" element, the court noted that the surrounding circumstances and expectations of the parties were critical, because knowledge of the existence of a violation must usually be inferred. 522 F.2d at 95-96; see Herman & MacLean v. Huddleston, 459 U.S. 375, 103 S.Ct. 683, 692 n. 30, 74 L.Ed.2d 548 (1983). For instance, stronger evidence of complicity would be required for the alleged aider and abettor who conducts what appears to be a transaction in the ordinary course of his business. The court observed that knowledge could be shown by circumstantial evidence, or by reckless conduct, but cautioned that "the proof must demonstrate actual awareness of the party's role in the fraudulent scheme." 522 F.2d at 96.
 
 
 18
 In discussing the knowing and substantial assistance requirement, the court focused on the kinds of assistance an aider and abettor might offer to the primary violator. For a defendant whose only role is to remain silent in the face of securities violations, liability might depend upon a duty owed to the other parties to the transaction. A defendant who is not under any duty to disclose can be found liable as an aider and abettor only if he acts with a high degree of scienter, that is, with a "conscious intent" to aid the fraud. On the other hand, liability could be imposed upon an aider and abettor who is under a duty to disclose if he acts with a lesser degree of scienter. For an aider and abettor who combines silence with affirmative assistance, the degree of knowledge required should depend upon how ordinary the assisting activity is in the involved businesses. Id. at 96-97.
 
 
 19
 If the evidence shows no more than a transaction constituting the daily grist of the mill, we would be loathe to find 10b-5 liability without clear proof of intent to violate the securities laws. Conversely, if the method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability.
 
 
 20
 Id. at 97. The court reiterated that the assistance must be substantial, a conclusion to be drawn after evaluating all the circumstances. Id.
 
 
 21
 Although Woodward was decided prior to the decision in Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), in which the Supreme Court announced that scienter, "a mental state embracing an intent to deceive, manipulate, or defraud," 425 U.S. at 193 n. 12, 96 S.Ct. at 1381 n. 12, was a necessary element of proof in a cause of action for damages under section 10(b) and Rule 10b-5, the Fifth Circuit required proof of scienter at the time the Woodward court acted. 522 F.2d at 93; see Sargent v. Genesco Inc., 492 F.2d 750, 761 (5th Cir.1974). The Hochfelder court declined to address the issue of whether "reckless" behavior is sufficient for civil liability under section 10(b) and Rule 10b-5. 425 U.S. at 193 n. 12, 96 S.Ct. at 1381 n. 12. The rule in this circuit is that "severe recklessness" satisfies the scienter requirement. White v. Sanders, 689 F.2d 1366, 1367 n. 4 (11th Cir.1982); Broad v. Rockwell International Corp., 642 F.2d 929, 961 (5th Cir.) (en banc), cert. denied, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981).
 
 
 22
 Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.
 
 
 23
 Broad, 642 F.2d at 961-62.[9] Severe recklessness can satisfy the scienter requirement in an aiding and abetting case, at least where the alleged aider and abettor owes a duty to the defrauded party.[10] Woodward, 522 F.2d at 96-97; see also Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 44 (2d Cir.), cert. denied, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); IIT v. Cornfeld, 619 F.2d 909, 923-25 (2d Cir.1980).
 
 
 24
 III. DID BARNETT BANK AID AND ABET THE VIOLATION?
 
 
 25
 The parties agree that plaintiffs were the victims of a securities fraud. Indeed, in the words of Chief Judge Fulton, who presided at the action brought by the SEC, the scheme amounted to "a horrible fraud, one that has been vicious and brutal. It is difficult to imagine how anyone could contrive and execute a more diabolical scheme." SEC v. R.J. Allen & Associates, 386 F.Supp. 866, 874 (S.D.Fla. 1974). The primary violations included Alexander & Allen, Inc.'s solicitation of purchasers for bond issues by making numerous material misrepresentations and omissions. In particular, the court found a failure to disclose that the principals of the underwriter also controlled the recipient of the proceeds, a relationship that allowed Alexander and Allen to derive substantial benefits from any sales of the bond issue. Id. at 872-73. In addition, the underwriter engaged in other practices that "so pervaded their business that they rendered the entire operation a fraudulent and deceptive scheme and course of conduct designed to defraud investors," id. at 873, including: false assurances to customers that the bond issues were insured; unkept promises to customers that the underwriter would repurchase bonds; sending bonds that differed from the ones customers ordered; and accepting customers' money without purchasing bonds ordered. Id. at 873-74.[11]
 
 
 26
 The fraud, however, did not end with the misrepresentations, omissions, and other activities described above. Until the proceeds of the bond issue were released to A & A Enterprises, they were accumulating at Covington County Bank. As it happened, the proceeds never should have been distributed, because the underwriter never purchased the entire issue. Thus, obtaining early release of the proceeds was part and parcel of the scheme to defraud the investors.[12]
 
 
 27
 The second requirement for establishing the aiding and abetting violation requires proof of Barnett Bank's "general awareness" of its role in the primary fraud. As previously stated, where a defendant is under some duty to the defrauded party, liability can be imposed on an aider and abettor whose conduct is severely reckless. The court below applied a recklessness standard, reasoning that when Smith wrote the letter to the trustee bank, he assumed a special duty to the bank and the bondholders because of the "special code of confidence among bankers." We agree that the recklessness standard is appropriate here because of Smith's communication to the trustee bank. See First Virginia Bankshares v. Benson, 559 F.2d 1307, 1317 (5th Cir.1977), cert. denied, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978). Several courts have applied a recklessness standard to alleged aiders and abettors who have issued statements or certifications foreseeably relied upon by investors, reasoning that a duty to disclose arises under such circumstances. See, e.g., Fund of Funds, Ltd. v. Arthur Andersen & Co., 545 F.Supp. 1314, 1356-57 (S.D.N.Y.1982) (accountant's audit); Morgan v. Prudential Group, Inc., 527 F.Supp. 957, 960-61 (S.D.N.Y.1981) (law firm's tax opinion letter). In communicating to the trustee bank, Smith was under a duty to speak truthfully, or stated alternatively, a duty not to communicate something that he knew to be incorrect, or something for which he had little or no basis for belief. Although Smith's communication did not reach the actual investors, it was foreseeably relied upon by the trustee bank that was to hold the investors' money until the entire bond issue was purchased.[13]
 
 
 28
 Focusing our attention on the February 22nd letter from Smith to Covington County Bank, circumstances surrounding the letter support the inference that Smith was severely reckless. Alexander and Allen had already received a letter of recommendation from Barnett Bank's vice president. Not satisfied with this letter they turned to Smith, who had brought their account into the bank. After they told Smith why Prentiss' letter was not strong enough, Smith asked what would be more appropriate. The end result was a letter essentially dictated by Alexander and Allen and signed by Smith. Smith wrote this letter without knowing whether any of its details were in fact true.[14] This qualifies as severely reckless conduct, as Smith's representation was given without basis in reckless disregard of its truth or falsity. See Rolf, 570 F.2d at 47-48. Smith may not have known of all the details of the primary fraud--the misrepresentations, omissions, and other fraudulent practices. Yet, the record evidences that he was aware that Alexander and Allen were involved in the Tuskegee bond issue and of some of the problems associated with it. Moreover, the circumstances surrounding the issuance of the letter were suspicious, to say the least. The district court found that Smith wrote this letter with the sole purpose of "currying favor" with a good client of the bank, which establishes an improper motive for not probing more deeply into Alexander and Allen's operations before he acted. See Stokes v. Lokken, 644 F.2d 779, 784 (8th Cir.1981). We conclude therefore that Smith's severe recklessness suffices to establish the second element necessary for liability.
 
 
 29
 Smith's assistance in the fraud was both knowing and substantial. The method used to assist the fraud was atypical. Woodward teaches that knowing assistance can be inferred from atypical business actions. 522 F.2d at 97. Although it is perhaps a common practice for a bank to write such a reference for one of its customers, the act of issuing a letter containing statements of which the writer has no knowledge, without even minimal investigation to determine whether its contents are accurate, solely for the purpose of "currying favor" with a good client, can hardly be regarded as "the daily grist of the mill." Moreover, Smith was aware that the bank receiving this letter would rely on this letter, treating it as an expression of confidence. The letter also played a substantial role in assisting Alexander and Allen to perpetrate the fraud. The district court found that Covington County Bank relied on this letter in deciding to release the proceeds of the bond issue that had been accumulating. Although the evidence on this question is far from overwhelming, there is sufficient evidence to support this finding, given our clearly erroneous standard of review. Fed.R.Civ.P. 52(a).
 
 
 30
 Barnett Bank contends that the district court's conclusion of substantial assistance was based on a "but for" test, which has been rejected as insufficient. See Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 61-62 (2d Cir.1985); Edwards & Hanly v. Wells Fargo Securities, 602 F.2d 478, 484 (2d Cir.1979), cert. denied, 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980); Landy v. FDIC, 486 F.2d 139, 163-64 (3d Cir.1973), cert. denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). We disagree. Substantiality is based upon all the circumstances surrounding the transaction in question. Woodward, 522 F.2d at 97. The bond offering in question was represented to be conditional upon the underwriter's purchase of the entire issue. Alexander and Allen, with Smith's assistance, circumvented this requirement by convincing the trustee bank to allow the issue to proceed piecemeal and to release the proceeds to them. This act sealed the fate of the investors' money. Smith's act, therefore, was a causal factor in the perpetration of the fraud and in the cumulation of the investors' losses. See Rolf, 570 F.2d at 48. Hence we affirm the trial court's judgment that Barnett Bank is liable as an aider and abettor.[15]
 
 IV. COMPENSATORY DAMAGES
 
 31
 The appropriate method of computing damages in most Rule 10b-5 actions is the out-of-pocket rule. Huddleston v. Herman & MacLean, 640 F.2d 534, 555 (5th Cir.1981) (Unit A) affirmed in part and reversed in part on other grounds, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). See Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972). In their brief, the class members claim gross out-of-pocket losses totaling $2,128,000, a figure unchallenged by Barnett Bank. From this, plaintiffs subtracted several items, including the amounts the class received in settlement of the Alabama class action, to arrive at a figure, $1,382,386, they claim represents their net unrecovered losses. Plaintiffs asked for and the district court awarded $550,000 in damages, an amount equal to the sum total of bond proceeds released to A & A Enterprises.
 
 
 32
 Barnett Bank challenges this amount as excessive because the court failed to reduce the award by the amount of bond proceeds put to their proper purpose. This argument is misguided. The entire bond issue defaulted after the recipients of the proceeds made only two interest payments. Thus, even if only a portion of the proceeds released were diverted to an improper end, this would not affect the amount the plaintiffs are "out-of-pocket."
 
 
 33
 Barnett Bank also argues that the court should have reduced the award by the amount received by the class as a result of the settlements of the Alabama class action suit. According to plaintiffs' figures, their out-of-pocket losses total over 1.3 million, after subtracting the amount recovered in the Alabama litigation. The Bank makes no showing that any of the figures reproduced in plaintiffs' brief, including the amount recovered in the Alabama lawsuit, are inaccurate.
 
 
 34
 Finally, the Bank argues that its liability should be limited to the amount of proceeds distributed before April 23, 1974, at which time the trustee bank knew that the underwriter could not perform its obligation to pay for the bonds within the time provided in the underwriting agreement. There is no evidence supporting Barnett Bank's theory that its participation in the securities fraud "ended" on that date. Accordingly, we affirm the award of damages.
 
 V. CROSS-APPEAL
 
 35
 The class cross-appealed the district court's refusal to assess attorneys' fees, punitive damages, and prejudgment interest against Barnett Bank. Punitive damages are not available in a 10b-5 action. Huddleston v. Herman & MacLean, 640 F.2d at 559. The class members claim that they proved violations of state law, for which punitive damages are available. The district court, however, declined to rule on the state law claims after making its conclusion with respect to 10b-5 liability. Thus, the plaintiffs are not entitled to punitive damages.
 
 
 36
 The award of prejudgment interest in a 10b-5 case is governed by standards of fairness and rests within the district court's sound discretion. Blau v. Lehman, 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403 (1962); Wolf v. Frank, 477 F.2d 467, 479 (5th Cir.), cert. denied, 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973). We perceive no abuse of discretion in the district court's denying prejudgment interest in this case.
 
 
 37
 As for the award of attorneys' fees, in Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the Supreme Court expressed strong support for the "American Rule," which prohibits the imposition of the prevailing party's attorneys' fees on an opponent except when authorized by statute or when a traditionally recognized exception is applicable. There is no statutory provision permitting assessment of attorneys' fees in an action brought under Rule 10b-5. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 211 n. 30, 96 S.Ct. 1375, 1389 n. 30, 47 L.Ed.2d 668 (1976). Deviation from the "American Rule" may be appropriate if an unfounded action or defense is brought or maintained for oppressive reasons, or if an opponent has acted in bad faith, vexatiously, or wantonly. Alyeska, 421 U.S. at 258-59, 95 S.Ct. at 1622; Hall v. Cole, 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973). The bad faith or vexatious conduct must be part of the litigation process itself. Barton v. Drummond Co., 636 F.2d 978, 985 (5th Cir.1981) (Unit B);[16] Nemeroff v. Abelson, 620 F.2d 339, 348 (2d Cir.1980). Vexatious conduct inherent in the fraudulent acts that make up the 10b-5 cause of action cannot be the basis for an attorneys' fee award because punitive damages are not available in a 10b-5 action. Straub v. Vaisman & Co., 540 F.2d 591, 599 (3d Cir.1976).
 
 
 38
 The plaintiffs' claim for attorneys' fees is based upon the Bank's failure to turn over to the class $50,000 in certificates of deposit used to secure a personal loan to Alexander that was foreclosed by the bank. Plaintiffs argue that the Bank's retention of these funds violated several court orders and that Barnett Bank forced the plaintiffs to sue to protect their rights. Finding these allegations to be true, the court below nevertheless declined to award the plaintiffs attorney's fees, a ruling with which we agree. Plaintiffs' recovery of the $50,000, which was part of the proceeds released to A & A Enterprises, was subsumed within the total award of $550,000, which was based on Barnett Bank's liability as an aider and abettor. Because they did not prevail on the theory that the Bank should have turned over the $50,000 to comply with a court's order, but instead were entitled to that sum for other reasons, they are not entitled to attorneys' fees under the bad faith exception.
 
 
 39
 For the foregoing reasons, the decision of the court below is AFFIRMED.
 
 
 
 *
 Honorable Edward S. Smith, U.S. Circuit Judge for the Federal Circuit, sitting by designation
 
 
 [1]
 The decision of the court below is reported at 575 F.Supp. 622 (S.D.Fla.1983)
 
 
 [2]
 Alexander testified that he disassociated himself from the firm of Alexander & Allen, Inc. in November, 1973. Shortly thereafter he opened an investment counseling firm, H. William Alexander & Associates. Alexander continued his involvement with the bond issue because of his association with All Enterprises and A & A Enterprises
 
 
 [3]
 For its efforts as underwriter, Alexander & Allen, Inc. received a fee in the form of a 15% discount when it paid for the bonds
 
 
 [4]
 Alexander testified that the bonds were distributed to investors in the following fashion. The underwriter would send money to the trustee bank and direct the trustee to mail bonds to a particular customer. Or, the bank would send the bonds to Barnett Bank; if the underwriter had enough money to pay for the bonds, Barnett would release the bonds to the underwriter, which would in turn deliver them to customers. Alexander characterized this method of piecemeal distribution as unusual
 
 
 [5]
 Secondary liability under the securities laws ... is [a term] used to describe the judicially implied civil liability which has been imposed on defendants who have not themselves been held to have violated the express prohibition of the securities statute at issue, but who have had some relationship with the primary wrongdoer. Courts have imposed this type of liability on defendants who aid and abet, conspire with, or employ a defendant who does violate the express prohibition of a statute
 Fischel, Secondary Liability Under Section 10(b) of the Securities Act of 1934, 69 Calif.L.Rev. 80, 80 n. 4 (1981).
 
 
 [6]
 In the court below, appellees urged that Barnett Bank assisted the 10b-5 violation in other ways: acting as the clearing agency for distribution of the bonds; loaning $26,000 to the underwriter; holding substantial amounts of money in depository accounts owned by the various companies associated with Alexander and Allen; and issuing cashier's checks and wire transfers to assist in the unlawful distribution of the proceeds. The district court concluded that all of these actions were normal banking functions performed by Barnett Bank without any knowledge that it was assisting illegal activity. Although appellees contend that these acts further evidence Barnett Bank's involvement in the securities fraud, we decline to consider whether they suffice to establish aiding and abetting liability
 
 
 [7]
 The Eleventh Circuit, in the en banc decision Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981
 
 
 [8]
 This three-part test, with slight variations, has been accepted by every circuit that has considered the issue of aiding and abetting 10b-5 violations. See, e.g., Cleary v. Perfectune Inc., 700 F.2d 774, 777 (1st Cir.1983); Harmsen v. Smith, 693 F.2d 932, 944 (9th Cir.1982), cert. denied, --- U.S. ----, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); SEC v. Washington County Utility Dist., 676 F.2d 218, 224 (6th Cir.1982); Stokes v. Lokken, 644 F.2d 779, 782-83 (8th Cir.1981); Investors Research Corp. v. SEC, 628 F.2d 168, 178 (D.C.Cir.) cert. denied, 449 U.S. 919, 101 S.Ct. 317, 66 L.Ed.2d 146 (1980); IIT v. Cornfeld, 619 F.2d 909, 922 (2d Cir.1980); Edward J. Mawood & Co. v. SEC, 591 F.2d 588, 595-96 (10th Cir.1979); Monsen v. Consolidated Dressed Beef Co., 579 F.2d 793, 799 (3d Cir.), cert. denied, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978). The Supreme Court has yet to consider whether civil liability for aiders and abettors of Rule 10b-5 violations is appropriate. Herman & MacLean v. Huddleston, 459 U.S. 375, 103 S.Ct. 683, 686 n. 5, 74 L.Ed.2d 548 (1983); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 1380 n. 7, 47 L.Ed.2d 668 (1976)
 
 
 [9]
 Although the Broad court used the modifier "severe" in its characterization of what kind of reckless conduct can satisfy 10b-5 scienter requirement, its definition of severe recklessness is identical to that used by other courts to describe what conduct they considered reckless. See, e.g., Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir.), cert. denied, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); Sanders v. John Nuveen & Co., 554 F.2d 790, 792-93 (7th Cir.1977) cert. denied, 450 U.S. 1005, 101 S.Ct. 1719, 68 L.Ed.2d 210 (1981); Franke v. Midwestern Oklahoma Development Authority, 428 F.Supp. 719, 725 (W.D.Ok.1976), remanded with instructions, 619 F.2d 856 (10th Cir.1980)
 
 
 [10]
 For a description of some of the kinds of duties courts have considered sufficient, see Cleary v. Perfectune, Inc., 700 F.2d 774, 777 (1st Cir.1983); see also Woodward, 522 F.2d at 97 n. 28
 
 
 [11]
 Alexander & Allen, Inc. was involved in other unsuccessful bond issues that gave rise to litigation. See Cronin v. Midwestern Oklahoma Development Authority, 619 F.2d 856 (10th Cir.1980); Woods v. Homes & Structures of Pittsburg, 489 F.Supp. 1270 (D.Kan.1980). Some of the court's findings described above may relate to these or other bond issues
 
 
 [12]
 Another bond offering involving Alexander & Allen, Inc. as underwriter proceeded in a manner similar to the Tuskegee issue. In the litigation that followed, the district court denied the trustee bank's motion for summary judgment, reasoning that the trustee bank could have aided and abetted the 10b-5 violation by diverting the proceeds to the primary wrongdoer in violation of its trust obligation. Woods v. Homes & Structure of Pittsburg, 489 F.Supp. 1270, 1278-80 (D.Kan.1980)
 
 
 [13]
 Prior to the February 22 letter, Smith had acted as a reference for Alexander & Allen, Inc. when Covington County Bank was gathering information to assist it in determining whether it should become trustee for the Tuskegee bond issue
 
 
 [14]
 There is no evidence that Alexander & Allen, Inc. had performed any other underwriting obligation as of the date of Smith's letter. Although this corporation may have maintained a good relationship with the Bank up until that time, that does not sanction the writing of this letter
 
 
 [15]
 Barnett Bank does not question the theory used to impose liability on it for its employee's actions
 
 
 [16]
 We are bound by all decisions of the former Fifth Circuit, Unit B. Stein v. Reynolds Securities, Inc., 667 F.2d 33, 34 (11th Cir.1982)