**In re COMPTRONIX SECURITIES LITIGATION.**

Norman W. **HARRIS**, Jr., as Trustee for the R.L. and J.J. Pockman Charitable Remainder Trust, suing on behalf of himself and all others similarly situated, Plaintiffs,

v.

**COMPTRONIX CORPORATION,** et al., Defendant.

No. CV92–PT–02752–M.

United States District Court, N.D. Alabama, M.D.

Aug. 31, 1993.

David J. Guin, Ritchie & Rediker, P.C., Birmingham, AL, Daniel L. Berger and Pamela E. Kulsrud, Bernstein Litowitz Berger & Grossmann, New York City, for plaintiffs.

M. Stanford Blanton and R. Bruce Barze, Jr., Balch & Bingham, Birmingham, AL, for defendant.

## MEMORANDUM OPINION

PROPST, District Judge.

This cause comes to be heard on the Motions to Dismiss filed by defendants W.L. Matthews ("Matthews") and The Home Bank

on May 10, 1993 which were converted to Motions for Summary Judgment by an order filed July 1, 1993.[1]

## I. SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate only if this court concludes that there exists no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A party seeking summary judgment bears the initial responsibility of informing this court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552. Once the moving party has met this burden, the nonmoving party "must produce evidence that shows there exists a genuine issue of material fact." *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir.1988). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by affidavits, or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing there exists a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. The court may consider the offered "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any ..." in deciding whether to grant or deny a summary judgment motion. Fed.R.Civ.P. 56(c). In making the determination of whether a given factual dispute requires submission to a jury, the court must view the presented evidence through the prism of the substantive evidentiary burden.

1. The court has been advised that plaintiffs have settled with all defendants except Matthews and The Home Bank. Plaintiffs have not filed an affidavit pursuant to Fed.R.Civ.P. 56(f) or otherwise suggested that the motions are not ready for consideration.

2. The three officers and their positions at Comptronix during the class period were:

*Anderson*, 477 U.S. at 254–55, 106 S.Ct. at 2513–14.

## II. ALLEGATIONS IN COMPLAINT

In a complaint filed on November 25, 1992, as amended March 18, 1993, plaintiffs assert a "securities class action on behalf of all persons and entities who purchased common stock or 6.75% convertible subordinated debentures due 2002 of [defendant] Comptronix Corporation ("Comptronix" or the "Company") between November 25, 1989 and November. 24, 1992." (Plaintiff's Complaint at 2). The plaintiffs claim that during the class period Comptronix and three of its officers [2] engaged in a scheme to misstate the financial condition of the corporation by improper accounting practices. Plaintiffs describe Comptronix's alleged scheme as follows:

The scheme entailed the publication of materially false financial statements for Comptronix for at least three years, which materially overstated Comptronix sales, profits and income; understated costs; overstated inventories, equipment, fixed assets and stockholder's equity ... Hebding [would] instruct Medlin to artificially reduce operating expenses and increase inventory on a monthly basis. Hebding would tell Medlin at the end of each month ... the amount by which he wanted to inflate inventory. Medlin would make these adjustments to costs and inventory in the monthly financial statements without any justification or support. By the end of the year, inventory would be inflated, and costs reduced, by several million dollars. Because a physical inventory count was to be conducted ... Hebding instructed Medlin to shift the fictitious inventory into the Comptronix equipment account. To accomplish this, Medlin and/or Shifflett would prepare a fake invoice from a third-party vendor for a purported

William J. Hebding—chairman of the board and chief executive officer;
Allen L. Shifflett—chief operating officer and director;
J. Paul Medlin—treasurer and assistant secretary.

equipment purchase by Comptronix. After creating the fictitious equipment purchase, Medlin would prepare a check drawn on an account at Home Bank ... made payable to the third-party vendor. However, Medlin would never actually send the check to the vendor ... [but] would deposit the check back into Comptronix's account at Home Bank, even though there was no endorsement by the payee. At about the same time as the fictitious equipment purchases, Medlin, Hebding and Shifflett would create a fictitious sale of the fictitious inventory and would reflect the re-deposited checks as payment received for inventory sales.

(Plaintiffs' Complaint at 2, 28–30). When questioned by defendants, Hebding explained to Matthews that the re-deposit practice was necessary due to Comptronix's "check-driven" accounting system. Comptronix purportedly dealt with certain companies as both purchasers and suppliers. To simplify the accounting process, Comptronix had allegedly obtained the consent of these special customers to allow Comptronix to re-deposit the checks into Comptronix's account to offset their accounts payable and receivable, thereby creating a record of the transaction.[3]

The alleged scheme caused an artificial inflation of the reported income and net worth of the Company, and consequently, of the market price of Comptronix securities during the class period. Upon public disclosure of the fraud, the market price of the securities plunged, resulting in plaintiffs' losses.

### The Role of Matthews and The Home Bank

The Home Bank, an independent commercial bank in Guntersville, Alabama, served as local bank for Comptronix. Matthews was an officer of The Home Bank during the class period. Count VI of the Amended Complaint alleges that Matthews and The Home Bank "aided and abetted violations of Section 10(b) of the Exchange Act, 15 U.S.C.

§ 78j(b), and Rule 10b–5 promulgated thereunder, by Comptronix and defendants Hebding, Shifflett and Medlin." (Plaintiff's Complaint at 67). The factual allegations upon which this claim is based are contained in paragraphs 22 and 58 of Plaintiff's Complaint. In paragraph 22, the plaintiffs allege that:

Home Bank had a written agreement with Comptronix, which allowed Comptronix to deposit unendorsed checks into a check reconciliation account, thereby providing the facilities to further and assist defendant's fraud ... As an officer, Matthews was responsible for negotiating and entering into this agrement with Comptronix.

(Plaintiff's Complaint at 16). Additionally, in paragraph 58, plaintiffs allege that:

through an unusual agreement with Home Bank, ... [defendant Medlin] would deposit [checks drawn on Comptronix's account at Home Bank and made payable to third party vendors] back into Comptronix's account at Home Bank, even though there was no endorsement by the payee. Upon information and belief, Home Bank agreed to allow such re-deposits without endorsement without ever seeking permission or authorization of the payees named on the checks. Lee Matthews, as an officer of Home Bank, agreed to the practices despite having serious questions as to its propriety.

(Plaintiff's Complaint at 16, 29–30).

### III. AIDING AND ABETTING UNDER SECTION 10(b) AND RULE 10b–5

The Home Bank and W.L. Matthews are charged as aiders and abettors. "A person may be held as an aider an abettor only if some other party has committed a securities law violation, if the accused party had a general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor *knowingly* and substantially *assisted the violation.*" *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 94–95

---

**3.** Medlin, in an affidavit filed by plaintiffs in opposition to this motion, testified that Mr. Hebding "explained to defendant Matthews ... that Comptronix needed to redeposit checks in order to off-set payables and receivables from certain customers who had supplied Comptronix with materials used in manufacturing the printed circuit boards." (Affidavit of J. Paul Medlin at 2). The plaintiffs have not disputed the fact that this explanation was given to the defendants.

(5th Cir.1975) (emphasis added), quoting *SEC v. Coffey,* 493 F.2d 1304, 1316 (6th Cir. 1974), *cert. denied,* 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975). Thus, there is a three-pronged analysis for determining aider-abettor liability per *Woodward:* (1) a primary securities violation, (2) requisite scienter, and (3) *knowing* and substantial *assistance to the primary violation. Id. See also Woods v. Barnett Bank of Ft. Lauderdale,* 765 F.2d 1004, 1009 n. 8 (11th Cir.1985); *Schneberger v. Wheeler,* 859 F.2d 1477, 1480 (11th Cir.1988), *cert. denied,* 490 U.S. 1091, 109 S.Ct. 2433, 104 L.Ed.2d 989 (1989).

### a. Scienter

■ As applied to Section 10(b) and Rule 10b–5, "the term 'scienter' refers to a mental state embracing an intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976). The first issue is whether the "scienter" must relate to the *primary securities violation,* or whether scienter related to any improper activity or fraud will suffice. Or, stated another way, may a party be held liable as an aider-abettor to the primary 10(b) or Rule 10b–5 violation if that party has no knowledge of or intent to aid such *primary violation?*

The Eleventh Circuit, and its predecessor the Fifth, have suggested that the scienter necessary to establish aider-abettor liability must relate to the *primary securities violation.* In *Woodward,* the Fifth Circuit, "[m]indful of the potentially devastating impact aiding and abetting liability might have on commercial relationships, . . . carefully elucidated the second and third prongs of its test." *Woods,* 765 F.2d at 1009. In formulating its test, the *Woodward* court compared the elements adopted by the Sixth and Third Circuits as follows:

*Sixth Circuit:*

Without meaning to set forth an inflexible definition of aiding and abetting, we find that a person may be held as an aider and abettor only if some other party has committed a securities law violation, if the accused party had general awareness that his role was part of an overall activity that is improper, and if the accused aider-abet-tor *knowingly* and substantially assisted *the violation.*

*SEC v. Coffey,* 493 F.2d at 1316 (emphasis added).

*Third Circuit:*

The elements adopted by the Third Circuit in *Landy v. Federal Deposit Ins. Corp.,* 486 F.2d 139 (3d Cir.1973), *cert. denied,* 416 U.S. 960 [94 S.Ct. 1979, 40 L.Ed.2d 312] (1974), are similar to the *Coffey* test, but *Landy* refers to 'an independent wrong' instead of a securities law violation, and knowledge of the wrong's existence instead of awareness of a role in improper activity. Finally, *Landy* omits the 'knowing' requirement for the substantial assistance aspect.

*Woodward,* 522 F.2d at 95. Based on this comparison, the *Woodward* court concluded that:

The first two *Landy* elements pose a danger of overinclusiveness and seem to lose sight of the *necessary connection to the securities laws.* One could know of the existence of a 'wrong' *without being aware of his role in the scheme,* and *it is the participation that is at issue.* The scienter requirement scales upward when the activity is more remote; therefore, the assistance rendered should be *both* substantial and *knowing.* A remote party must not only be aware of his role, but he should also know when and to what degree he is furthering *the fraud.*

*Id.* (emphasis added). In choosing the more specific *Coffey* elements rather than the "over-inclusive" *Landy* test, the Fifth Circuit circumscribed the scope of aider-abettor liability by requiring scienter to be related to the *primary securities violation,* thereby preserving the "necessary connection to the securities laws." *Id.* The court concluded its discussion of scienter by quoting Professor Ruder:

If all that is required in order to impose liability for aiding and abetting is that illegal activity under the securities laws exists and that a secondary defendant, such as a bank, gave aid to that illegal activity, the act of loaning funds to the market manipulator would clearly fall with-

in that category and would expose the bank to liability for aiding and abetting. Imposition of such liability upon banks would virtually make them insurers regarding the conduct of insiders to whom they loan money. If it is assumed that an illegal scheme existed and the bank's loan or other activity provided assistance to that scheme, some remaining distinguishing factor must be found in order to prevent such automatic liability. The bank's *knowledge of the illegal scheme* at the time it loaned the money or agreed to loan the money provides that additional factor. Knowledge of wrongful purpose thus becomes a crucial element in aiding and abetting or conspiracy cases.

*Id.* at 96, quoting Ruder, *Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy,* In Pari Delicto, *Indemnification, and Contribution,* 120 U.Pa.L.Rev. 597, 630–31 (1972) (emphasis added). "Knowingly engaging in a customary business transaction which incidentally aids the violation of securities laws, without more, will not lead to liability." *Id.* For the Eleventh Circuit's latest statement of the law on aider-abettor liability, *see Schneberger,* 859 F.2d at 1480.[4]

■ Does the degree of scienter required vary according to the circumstances of each case? Two variables may alter the level of scienter required to prove aider and abettor liability. The first variable to consider is the "kind[ ] of assistance an aider and abettor might offer to the primary violator." *Woods,* 765 F.2d at 1010, citing *Woodward,* 522 F.2d at 96–97. An issue often raised is whether silence and inaction will satisfy the requirement. In addressing this issue, the *Woodward* court stated that:

> In a case combining silence/inaction with affirmative assistance, the degree of knowledge required should depend on how ordinary the assisting activity is in the

business involved. If the evidence shows no more than transactions constituting the daily grist of the mill, we would be loathe to find 10b–5 liability *without clear proof of intent to violate the securities laws.* Conversely, if the method or transaction is atypical or lacks business justification, it may be *possible* to infer the knowledge necessary for aiding and abetting liability.

*Woodward,* 522 F.2d at 97 (emphasis added). Note the apparent requirement, *in any event,* of an *intent to violate the securities laws.*[5]

For examples of transactions that are atypical, consider *Woods.* In that case, the primary actors were charged with securities law violations arising out of a bond issue. A trustee bank was to hold the investors' money until the entire bond issue was sold, but the primary actors desired an earlier funds release. To effectuate this goal, the primary actors asked a bank officer to write a customer recommendation letter to the trustee requesting early distribution to the customer. The bank officer was charged as an aider and abettor for obliging this request. Before discussing atypicality, the court in *Woods* stated:

> The second requirement for establishing the aiding and abetting violation requires proof of [the bank's] 'general awareness' of its role in the *primary fraud.* . . . [W]here a defendant is under some *duty to the defrauded party,* liability can be imposed on an aider and abettor whose conduct is severely reckless. The court below applied a recklessness standard, reasoning that when [the bank officer] wrote the letter to the trustee bank, he assumed a *special duty* to the bank and the bondholders because of the "special code of confidence among bankers." We agree that the recklessness standard is appropriate here because of [the officer's] communication to the trustee bank.

---

4. The *Schneberger* court stated that *"Woodward and Woods* make clear that knowledge of *both* the fraudulent scheme and of one's own role *in that scheme* is required." *Id.* (emphasis added). This court recognizes that these were not "customary" business transactions. The ultimate issue, however, is whether there was a "knowing" assistance to a securities violation.

5. The court assumes that a mere "possibility," without evidence to support a reasonable inference of knowledge and some degree of intent or recklessness *related to a securities violation,* is not sufficient.

*Woods*, 765 F.2d at 1011 (emphasis added). Based on the officer's admission that "he did not know the truth or falsity of the letter's contents," the court characterized the act as "severely reckless" and "atypical" and thus concluded that the "assistance was both knowing and substantial." *Id.* at 1012.[6] The *Woods* court also listed examples of "grist of the mill" transactions:

> In the court below, appellees urged that [the bank] assisted the 10b–5 violation in other ways: acting as the clearing agency for distribution of the bonds; loaning $26,-000 to the underwriter; holding substantial amounts of money in depository accounts owned by the various companies associated with [the primary violator]; and issuing cashier's checks and wire transfers to assist in the unlawful distribution of the proceeds. The district court concluded that all of these actions *were normal banking functions performed by [the bank] without any knowledge that it was assisting illegal activity.* Although appellees contend that these acts further evidence [the bank's] involvement in the securities fraud, we decline to consider whether they suffice to establish aiding and abetting liability.

*Id.* at 1009 n. 6 (emphasis added).

Another variable in the scienter formula is "the nature of the *duty* owed by the alleged aider and abettor to *the other parties to the transaction.*" *Woodward*, 522 F.2d at 96 (emphasis added). *Woodward* stated:

> When it is impossible to find any duty of disclosure, an alleged aider-abettor should be found liable only if scienter of the high "conscious intent" variety can be proved. Where some special duty of disclosure exists, then liability should be possible with a lesser degree of scienter.

*Id.* at 97. "The Supreme Court has decreed that under the federal securities laws, a duty to disclose 'arises from the relationship between the parties,' and will exist if there is 'a fiduciary or other similar relation of trust and confidence between them.'" *Schatz v. Rosenberg*, 943 F.2d 485, 490 (4th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1475,

117 L.Ed.2d 619 (1992) (quoting *Dirks v. SEC,* 463 U.S. 646, 658, 103 S.Ct. 3255, 3263, 77 L.Ed.2d 911 (1983) and *Chiarella v. United States,* 445 U.S. 222, 228, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980), respectively). The securities act may impose a duty on parties such as insiders, controlling persons, accountants, and brokers, depending on the circumstances. *Woodward,* 522 F.2d at 96.

■ The "lesser degree of scienter" referred to above is recklessness. According to *Woods,* "severe recklessness can satisfy the scienter requirement in an aiding and abetting case, at least where the alleged aider and abettor owes a duty to the defrauded party." *Woods,* 765 F.2d at 1010. However,

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.,* quoting *Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 961–62 (5th Cir.) (en banc), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). Note that, even when applying the lesser recklessness standard, the *Woods* court required proof of the aider and abettor's " 'general awareness' of its role in the *primary fraud,*" in order to preserve the necessary connection to the primary securities violation. *Woods,* 765 F.2d at 1011. This crucial requirement was satisfied in *Woods* due to a "record that evidence[d] that [the bank officer] was aware that [the primary actors] were involved in the ... bond issue and of some of the problems associated with it." *Id.* at 1012.

■ As stated above, the bank officer in *Woods* was "under a special duty to the [trustee] bank and the bondholders," which permitted application of the recklessness standard. *Id.* In addition to characterizing the act as "atypical," the *Woods* court held

---

6. The officer knew that a *bond issue* was directly involved, and of some of the problems associated with it. *Id.*

**1572**

that a bank officer's writing a recommendation letter containing affirmative misrepresentations "qualifie[d] as severely reckless conduct, as [defendant's] representation was given without basis in reckless disregard of its truth or falsity." *Id.* at 1012.[7]

**b. Knowing and Substantial Assistance**

■ A plaintiff must also show that the defendant "knowingly and substantially assisted the violation." *Woodward,* 522 F.2d at 94–95. It is important to note how "the knowledge requirement ... permeates the third element of [the] test," *Camp v. Dema,* 948 F.2d 455 (8th Cir.1991), making the above scienter analysis equally applicable to discussion of this final requirement. The two elements must not be considered in isolation.

■ In order to satisfy this element of the test, plaintiffs bear the burden of proving that defendants "proximately caused" the securities violation. *Metge v. Baehler,* 762 F.2d 621, 624 (8th Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). To meet this burden, plaintiffs must show that defendants were a "causal factor in the perpetration of the fraud." *Woods,* 765 F.2d at 1013. In all cases "the assistance must be substantial before liability can be imposed under 10b–5." *Woodward,* 522 F.2d at 97. "Substantiality is a function of all the circumstances." *Id.*

■ To summarize, "before someone can be caught within the net of aiding and abetting liability under Rule 10b–5, another party must have violated the securities laws, the alleged aider-abettor must be *generally*

*aware of his role in improper activity,* and he must *knowingly* render substantial assistance. Without these limitations, *the securities laws would become an amorphous snare for guilty and innocent alike.*" *Id.* at 97 (emphasis added).

**IV. DID THE HOME BANK AND W.L MATTHEWS AID AND ABET THE PRIMARY VIOLATION?**

In analyzing this question, *Woodward* asked: "Do these facts show that the bank had found a pigeon? Did the pigeon innocently nest in the bank's vault? Did the bank spread any bird seed to attract the pigeon to its ... window? The record may justify an inference that the bank was pleased with the arrangement, but [did the bank consciously help] to feed or to entice the pigeon into its precincts[?]" *Woodward,* 522 F.2d at 98.

**a. First Requirement: Primary Securities Violation**

Although the court does not now purport to resolve the question of whether a primary securities violation occurred, the existence of such a violation will be presumed for the purposes of this opinion.

**b. Second Requirement: Scienter**

■ To avoid summary judgment in this case, plaintiffs must demonstrate that there exists a genuine issue of material fact concerning defendants' scienter. As stated above, absent a duty of disclosure, plaintiffs

7. In opposing defendants' motions, plaintiffs rely heavily on *Woods.* Plaintiffs repeatedly quote the following language:

[The bank officer] may not have known of all the details of the primary fraud—the misrepresentations, omissions, and other fraudulent practices ... The district court found that [the bank officer] wrote this letter with the sole purpose of "currying favor" with a good client of the bank, which establishes an improper motive for not probing more deeply into [the primary actors'] operations before he acted. *Woods,* 765 F.2d at 1012. This case is distinguishable from *Woods* in two important respects. First, it is important to note that the court also stated that "the record evidences that [the bank officer] was aware that [the primary actors] were involved in *the bond issue* and *of some of the*

problems associated with it." *Id.* Thus, there was some evidence that the bank officer had *knowledge of the primary securities violation.* The record in this case is devoid of such evidence.

Second, because the bank officer in *Woods* was under a duty to the defrauded party, the court applied the recklessness standard. In this case, however, the defendants were under no duty to the defrauded parties, and thus cannot be held liable as aiders and abettors absent a showing of a "'conscious intent' to aid the fraud." *Id.* at 1010.

Due to these important differences, plaintiffs' undue reliance on *Woods* is misplaced. The duty found in *Woods* may have arisen out of the knowledge of the bond issue and the letter's relationship to it. The issues of knowledge and duty are likely intertwined.

must show that defendants acted with a "high degree of scienter" to impose aider and abettor liability under Rule 10(b) and 10b–5. *Id.* at 97. If the assisting transaction is "atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability." *Id.* Where some special duty of disclosure exists, severe recklessness may satisfy the scienter requirement. *Id.*

(1) Is there a genuine issue of material fact as to whether defendants possessed scienter of the "high 'conscious intent' variety"?

▓ Rather than producing evidence to demonstrate scienter of the "high 'conscious intent' variety," plaintiffs argue that The Home Bank and Matthews can be held liable as aiders and abettors to the primary securities violation without having *actual knowledge* of that violation.[8] In their liberal interpretation of aider/abettor scienter under 10b–5, plaintiffs state that actual knowledge may be inferred from defendants "general awareness" of any improper activity, and that acting with knowledge of a wrongful purpose will suffice.

▓ Although the court would agree with plaintiffs that defendants "may [not] escape liability by simply claiming [ignorance] of the securities laws," *Camp*, 948 F.2d at 459, "to satisfy the knowledge requirement, [plaintiff must show that defendant] had at minimum a general awareness of the *primary parties' violation of the securities laws.*" *Id.* at 462 (emphasis added). To reiterate, "*Woodward* and *Woods* make clear that knowledge of both the fraudulent scheme and of one's own role in that scheme is required..." *Schneberger*, 859 F.2d at 1480. Indeed, logic mandates that a party cannot knowingly "aid and abet" a securities violation if that party has no actual knowledge of such violation. In light of Eleventh Circuit precedent, plaintiffs' interpretation of the scienter requirement is incorrect.

▓ The plaintiffs do not allege that The Home Bank and Matthews possessed actual knowledge of the primary securities violation. Instead, plaintiffs interpret controlling case law as requiring application of a less stringent standard. For example, plaintiffs state that "Movants' scienter can be inferred from [their] general awareness that [their] role was part of an *overall activity* that is *improper* ... [and that] evidence that Movants acted with knowledge 'of wrongful purpose' would be sufficient." (Plaintiffs' Memorandum in Opposition to Motions for Summary Judgment of W.L. Matthews and The Home Bank at 16). Plaintiffs argue that defendants "should have known" of the alleged fraudulent scheme based on their consultation with counsel regarding the advisability of accepting the re-deposits, and their failure to more rigorously investigate Comptronix's explanation of the practice. However, "a bare inference that the defendant 'must have had' knowledge of the primary violation is insufficient." *Camp*, 948 F.2d at 459.[9] Boilerplate type allegations and *ipse dixit* arguments do not prove scienter at any level. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 629–30 (7th Cir.), *cert. denied*, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990)). Consequently, plaintiffs have failed to produce evidence creating a genuine issue of material fact as to whether defendants possessed the heightened scienter required to impose aider

---

8. Plaintiffs make the following arguments:
"Movants' *liability* can be established without any showing of their 'actual knowledge' of a securities law violation by Comptronix. Therefore, plaintiffs certainly do not have to *allege* that they had such knowledge." (Plaintiffs' Supplemental Memorandum in Opposition to Motions to Dismiss of W.L. Matthews, Jr., and The Home Bank at 9.).
"Movants' liability can therefore be established without any showing of their 'actual knowledge' of Comptronix's illegal conduct.... Movants would have the Court believe that ... the Eleventh Circuit 'explicitly requires knowledge of the underlying securities violation ... Such an inter-

pretation is not correct." (Plaintiffs' Memorandum in Opposition to Motions for Summary Judgment of W.L. Matthews, Jr. and The Home Bank at 17–18.) As is indicated, this court simply disagrees with this argument.

9. See also *Renovitch v. Kaufman*, 905 F.2d 1040, 1047 (7th Cir.1990) ("A plaintiff's case against an [aider/abettor] may not rest on a bare inference that the defendant 'must have had' knowledge of the facts. The plaintiff must support the inference with some reason to conclude that the defendant has thrown in his lot with the primary violators.").

and abettor liability, and cannot avoid summary judgment as to this element.

(2) Was the defendants' conduct atypical, permitting a reasonable inference of knowledge of the primary securities violation?

As stated above, "[i]n a case combining silence/inaction with affirmative assistance, the degree of knowledge required should depend on how ordinary the assisting activity is in the business involved." *Woodward*, 522 F.2d at 97. If the assistance consists of a transaction in the ordinary course of business ("daily grist of the mill"), the plaintiff must demonstrate "clear proof of intent to violate the securities laws." *Id.* But, if the transaction is atypical or lacks business justification, "it may be possible to infer the knowledge necessary for aiding and abetting liability." *Id.*

Plaintiffs claim that The Home Bank and Matthews engaged in the following atypical transactions lacking business justification from which to infer defendants' knowledge of a primary securities violation:

(i) "Redeposit scheme." Plaintiffs assert that permitting Comptronix to deposit checks payable to phantom payees without endorsements was contrary to the customary standards of the banking industry. To support this claim, plaintiffs rely on Ala. Code § 7–3–202 (1985), which states that a check must be properly endorsed before it may be deposited for payment at a bank.

(ii) Plaintiffs also state that The Home Bank should not have stamped Comptronix checks "for deposit only to the account of the within named payee," thereby guaranteeing the endorsement, as this is only permissible when a customer of a bank is depositing a check in his own account.

(ii) Acceptance of Hebding's explanation that the redeposit practice was necessary due to Comptronix's "check-driven accounting system." Plaintiffs do not contest that this explanation was given to Matthews by Comptronix officials.[10]

(iii) Consultation with counsel concerning the redeposit practice.

(iv) The "Indemnity Agreement." After investigating the re-deposit practice, The Home Bank was advised by counsel to obtain protection against the possibility of claims by the payees resulting from the practice. Thus, Comptronix and The Home Bank entered into an agreement which stated that *"with the consent of some of the Vendors,* Comptronix has requested [Home], to accept and deposit to the credit of Comptronix certain unendorsed checks ... drawn by Comptronix and payable to the Vendors ..."* (emphasis added).

Plaintiffs and their experts assert that these transactions were not "grist of the mill" in the banking industry, were "contrary to, and constituted an extreme departure from, the customary standards of the banking industry," and were acquiesced in merely to appease a good customer, Comptronix. (Affidavit of William Farr, Paragraph 3).[11]

Clearly it is a common practice for banks to deposit properly endorsed checks into a customer's account. Once The Home Bank discovered that the checks were not properly endorsed, they sought the advice of counsel, demanded an explanation from Comptronix, and entered into the Indemnity Agreement, which is attacked as being the most "atypical."

Plaintiffs argue that the Indemnity Agreement, in combination with the defendants' other acts, creates a clear inference that defendants had knowledge of the fraud and its impact on Comptronix's financial statements and that defendants closed their eyes to the fraud and obtained protection against payee claims in the event the scheme was unveiled. Defendants offer a very different explanation. Matthews states that The

---

10. Plaintiffs concede that "Hebding told Matthews that Comptronix had a "check driven" accounting system which required that the checks be deposited at Home Bank for "accounting purposes." (Plaintiffs' Memorandum in Opposition to Motions for Summary Judgment of W.L. Matthews, Jr. and The Home Bank at 7).

11. The court agrees that defendants likely did wish to accommodate a good customer. This is not the same as knowingly aiding and abetting a securities violation.

Home Bank did not know or have reason to know that these customer/payees were "phantom," and entered into the Indemnity Agreement merely as a precautionary measure against potential liability to those payees. In the Agreement itself, Comptronix misled defendants by affirmatively misrepresenting to defendants that the payees had consented to the re-deposit practice. (See underlined portion of Agreement, above).

In determining what is atypical, *Woodward* is instructive. In that case, defendant bank loaned money to its customer, the primary securities law violator, and was sued as an aider and abettor. Plaintiffs alleged that the bank made the loan with knowledge of its customer's financial problems, thereby knowingly assisting the primary violation. Despite, however, the plaintiffs' emphasis of this awareness, the court held that "[t]he most that can be said about this factor is that the bank would have needed more information in order to make an informed decision on [its customer's] solidity. However, *this bears only on the bank's willingness to assume risks; it does not tend to show conscious intent to violate Rule 10b–5." Woodward,* 522 F.2d at 98.

■■■ Similarly, The Home Bank's consultation with counsel and execution of the Indemnity Agreement merely reflect Home's concern about assuming the risk of payee claims. The indemnity was to protect against payee claims, not securities violations. It is a total stretch to suggest otherwise. Stockholders and bondholders were not mentioned. As such, plaintiffs have not produced sufficient evidence to create a genuine issue of material fact as to whether

these transactions were so atypical as to allow a finder of fact "to find 10b–5 liability without clear proof of intent to violate the securities laws." *Id.* at 97.[12]

(3) Is the "severe recklessness" standard applicable to this case? If so, were defendants' actions "severely reckless?"

■■■ The rule in this circuit is that "severe recklessness can satisfy the scienter requirement in an aiding and abetting case, at least where the alleged aider and abettor owes a duty to the defrauded party." *McDonald v. Alan Bush Brokerage Co.,* 863 F.2d 809, 814 (11th Cir.1989); *Woods,* 765 F.2d at 1010. "A duty of disclosure may exist where any person possesses inside information, or where the law imposes special obligations, as for accountants, brokers, or other experts, depending on the circumstances of the case." *Woodward,* 522 F.2d at 97 n. 28. Plaintiffs have presented no evidence to demonstrate the existence of a duty owed to them by defendants. "When it is impossible to find any duty of disclosure, an alleged aider-abettor should be found liable only if scienter of the high 'conscious intent' variety can be proved." *Id.* at 97.[13]

■■■ Assuming, for the purposes of this discussion, that recklessness was the appropriate standard, were the defendants' actions "severely reckless"? "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant, or is

12. The court recognizes that the subject transactions were "atypical" in that they varied somewhat from customary banking practices. However, the atypicality is not such to suggest "knowing" assistance of a *securities violation* or intent to violate the *securities laws.* Violations of banking laws, if any, are insufficient. The issue remains whether there was knowing assistance of a securities violation. If there had been an intent to aid and abet a securities violation, the indemnity agreement would have likely been broader in scope. The desire to protect against claims by the vendors was only "grist of the mill." The court does not *find,* of course, that defendants were doing anything illegal. The court will leave that issue to banking authorities.

13. Plaintiffs argue that in cases where affirmative action by the aider and abettor is alleged, a duty to disclose need not exist for recklessness to suffice. This interpretation is not supported by controlling case law. *See Woods,* 765 F.2d at 1010; *In re Mutual Savings Life Ins. Co. Litigation,* Supplemental Memorandum Opinion at 28, May 27, 1993. This court's ultimate decision does not depend upon whether there was such a duty because the court finds no knowledge of a securities violation or sufficient scienter regardless of the level of scrutiny.

so obvious that the defendant must have been aware of it." *Woods*, 765 F.2d at 1010.

■■■■ The use of severe recklessness to satisfy the scienter requirement is limited. *Id.* at 1010. The Ninth and Seventh Circuits have both held that, "[r]ather than being 'merely a greater degree of ordinary negligence,' recklessness is closer to 'a lesser form of intent.'" *Vacinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1435 (9th Cir.1984). In addition, the Fifth Circuit has noted that "'reckless behavior' must not be so liberally construed as to obliterate any discernible distinction between scienter and negligence." *Broad v. Rockwell Int'l Corp.*, 614 F.2d 418, 440 (5th Cir.1980), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). The *Woods* definition of recklessness also mandates that defendants know, or have reason to know, that their actions may mislead buyers or sellers. Finally, the application of the recklessness standard does not alleviate the plaintiffs' burden of proving a connection between defendants' severely reckless actions and the primary securities violation. *Woods*, 765 F.2d at 1011.

To support their claims of recklessness, plaintiffs point to the same transactions which they describe as "atypical." Plaintiffs fail to present evidence, however, demonstrating that these transactions bordered on an intent to deceive the plaintiffs. At best, plaintiffs characterize the actions of The Home Bank and Matthews as poor or illegal banking practices. "Proving [poor banking practices] may establish negligence, but it clearly falls short of demonstrating recklessness." *McDonald*, 863 F.2d at 815. Again, plaintiffs have failed to create an genuine issue of material fact as to this element.

#### c. Third Requirement: Knowing and Substantial Assistance

■■■■ The final requirement for aiding and abetting liability is that of *"knowing, sub-* stantial assistance of the violation." *Woodward*, 522·F.2d at 96 (emphasis added). To prove that defendants "knowingly" assisted the primary violation, plaintiffs must meet one of the scienter requirements discussed above. "Substantiality is based upon all·the circumstances surrounding the transaction in question." *Woods*, 765 F.2d at 1013. In addition, plaintiffs must produce evidence demonstrating that· The Home Bank and Matthews proximately caused the violation through such assistance. *Metge*, 762 F.2d at 624.[14]

■■■■ Plaintiffs assert that, by permitting the deposit of unendorsed checks into the Comptronix account, and stamping certain checks with a guaranteed endorsement, defendants "assisted [in the] creation of a paper trail that enabled Comptronix to avoid detection." Because the manipulation of Comptronix's financial records via the fictitious purchases and sales allegedly could not have occurred without the re-deposit practice, plaintiffs state that the defendants knowingly and substantially assisted the fraud.[15] This assistance, they allege, proximately caused the primary violation which resulted in plaintiffs' loss. Plaintiffs argue that it is unnecessary to show specific reliance on the bank's conduct by class members when they purchased Comptronix stock.

Defendants take a· different tack. Defendants first argue that the assistance was not "knowing" for the reasons discussed above in the scienter analysis. Defendants also assert that the assistance was not "substantial" because "the withdrawal and deposit of checks at Home amounted to a zero change of overall funds of Comptronix ..." Defendants, in support of their argument that plaintiffs have failed to meet the proximate cause requirement, rely on *Saltzman v. Zern*, 407 F.Supp. 49 (E.D.Pa.1976). In that case, plaintiff sued defendant bank for aiding and abetting a

---

14. *See also Mendelsohn v. Capital Underwriters, Inc.*, 490 F.Supp. 1069, 1084 (N.D.Cal.1979) (requiring a "substantial causal connection between the conduct of the alleged aider and abettor and the harm to the plaintiff."); *Landy v. Federal Deposit Ins. Corp.*, 486 F.2d 139, 163 (3d Cir. 1974), *cert. denied*, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1975) (requiring proof that "the

encouragement or assistance is a substantial factor in causing the resulting tort").

15. The court does not decide whether this assistance was necessary to the scheme or not. It apparently played a role. However, the court need not decide whether the books could have otherwise been "cooked."

securities fraud after it deposited two checks lacking one of two required signatures. Finding no proximate cause, the court, in granting summary judgment for the bank, held that the bank's actions were

> not sufficient to hold [it] liable as an aider or abettor.... [I]t would appear that the amount of "assistance" allegedly given by [the bank] was not such as to connect [it] with the actual fraud. Although Plaintiffs suggest that [the bank] may be the "proximate cause" of the alleged fraud, i.e. if [the bank] had never cashed the check, [the primary violator] could not have used those funds to purchase shares of ... stock, there has been no showing that [the bank] was involved in any manner with the actual purchase of stock.

*Id.* at 57. As defendants state, plaintiffs concede that the class did not rely on any act or omission of The Home Bank or Matthews in purchasing the Comptronix stock. Rather "plaintiffs and other members of the class relied, to their detriment, on [the auditor's] representations." Nor did the auditor rely on the actions of The Home Bank and Matthews, since he admitted that he "failed to examine Comptronix's canceled checks." (Plaintiff's Complaint at 61). Thus, it appears that no one specifically relied on defendants' actions.

As the court has already analyzed the "knowing" element and found plaintiff's proof inadequate, this element will not be discussed in relation to assistance. The court reiterates, however, that "the individual parts of the three-part test are not to be considered in isolation, but rather in relation to one another, especially the elements of scienter and substantial assistance. For example, where there is a minimal showing of substantial assistance, a greater showing of scienter is required." *Stokes v. Lokken,* 644 F.2d 779, 782–83 (8th Cir.1981) (citing *Woodward,* 522 F.2d at 95.) "Thus, the two fac-

tors vary inversely to one another ..." *Metge,* 762 F.2d at 624. Where, as in this case, there is an inadequate showing of knowledge, a greater showing of substantial assistance is required. While the court concludes that there is no reasonable inference of *"knowing"* assistance of a *securities* violation, the court does not reach the issue of whether there is substantial evidence creating a reasonable inference of "substantial assistance" or proximate cause.[16]

## V. CONCLUSION

"The record may justify an inference that the bank was pleased with the arrangement, but we cannot find any evidence of the bank's consciously helping to feed or to entice the pigeon into its precincts." *Woodward,* 522 F.2d at 98. Similarly, although the evidence produced by plaintiffs in this case may demonstrate that The Home Bank and Matthews were negligent or acted illegally under banking laws or regulations in their dealings with Comptronix, or were pleased with the arrangement they had with this large customer, the record is devoid of evidence of defendant's knowing, intentional or reckless assistance to the primary securities violation. There is no evidence that the defendants doubted the explanation given by the alleged primary violators, that is, that the re-deposit practice was necessary due to Comptronix's check-driven accounting practices. Nor is there any evidence that the defendants knew or had reason to know of the alleged primary violators' *true* purpose behind the re-deposit scheme. Furthermore, there is no evidence that the defendants ever contemplated or gave any consideration to the fact that the manner in which the transactions were handled could artificially inflate the price of stock, the value of bonds, or the corporate income. The law relied upon simply does not reach persons who *unknowingly* assist.

---

**16.** On the issue of proximate cause, *Saltzman* is somewhat on point. As in that case, the evidence produced by plaintiffs, at best, may suggest negligence or banking law violations on the part of The Home Bank and Matthews in their dealings with Comptronix. However, such allegations are clearly insufficient to connect defendants to the primary securities violation. "Rule 10b–5 was not designed to be the ethical Ten

Commandments for all securities transactions." *Woodward,* 522 F.2d at 91. Thus, the law requires more than some perceived ethical violation, and certainly more than negligence. *In re Mutual Savings Life Ins. Co. Litigation,* Supp. Mem. at 26. The court does not demean the arguments of either party on the issues of "substantial" assistance or proximate cause. The court simply does not reach the issues.

Plaintiffs thus cannot avoid summary judgment as to The Home Bank and Matthews.